UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CESAR CANO-ORTEGA,

        Petitioner,

                                      Case No. 25-cv-1919-pp

    v.

SAMUEL OLSON, KRISTI NOEM,
PAMELA BONDI, TODD M. LYONS
and SCOTT SMITH,

        Respondents.

---

**ORDER GRANTING PETITION, REQUIRING RESPONDENTS TO PROVIDE A
BOND HEARING AND CLOSING CASE**

---

On October 17, 2025, the Department of Homeland Security arrested
and detained the petitioner when he appeared for a "routine check-in
appointment" with Immigration and Customs Enforcement in Milwaukee. Dkt.
No. 1 at ¶¶3, 23. At the time of his arrest, the petitioner had lived in the United
States for three years with his wife and child and, without incident, had been
working for a company in Green Bay, Wisconsin. Id. at ¶¶2, 23. The petitioner
has been detained—without an individualized bond hearing—since the time of
his arrest.

On December 5, 2025, the petitioner filed a petition for writ of *habeas
corpus* under 28 U.S.C. §2241 seeking either release from custody or a bond
hearing under 8 U.S.C. §1226(a). Id. at 21. This court screened the petition
under Rule 4 of the Rules Governing Section 2254 Cases (applicable to 28

1

U.S.C. §2241 under Rule 1(b)) and ordered briefing. For the reasons explained in this order, the court will grant the petition and order the respondents to afford the petitioner a bond hearing or, if they cannot comply with that order, to release him.

## I.      Background

The facts are largely undisputed. A citizen of Nicaragua, the petitioner entered the United States without inspection on November 27, 2022. Dkt. No. 1 at ¶2. The petitioner settled in Green Bay, Wisconsin, where he found work at a company called Sanimax. Id. at ¶23. In 2023, the petitioner's wife joined him in the United States on advance parole, and his son was born in July 2025. Id. The petitioner has lived in the United States for three years. Id. at ¶2. He has participated in a monitoring program via his cell phone, but on October 17, 2025, technical problems caused ICE to call him for an in-person visit. Id. at ¶3. He expected that contractors would repair the hardware or software on his phone and that after the visit, he would return to his job and family in Green Bay. Id.

But on October 17, 2025, DHS arrested the petitioner at the Milwaukee Field Office and placed him in removal proceedings. Id. at ¶¶3, 4. He is charged with entering the United States without inspection in violation of 8 U.S.C. §1182(a)(6)(A)(i) and with not being in possession of a valid entry document in violation of 8 U.S.C. §1182(a)(7)(A)(i)(I). Dkt. No. 2-1 at 5. After his arrest, DHS placed him in removal proceedings before the Immigration Court under 8 U.S.C. §1229a, by filing a Notice to Appear. Id. at ¶24. On November 8, 2025,

2

the Chicago Immigration Court denied the petitioner "a custody redetermination" on the ground that it lacked jurisdiction to grant bond to aliens present in the United States without having been "admitted." Id. at ¶5 (Dkt. No. 2-3 at 1). In ruling, the court checked a box next to the statement, "This court lacks authority to hear bond requests or to grand bond to aliens who are present in the United States without admission. Matter of Yajure Hurtado, 29 I&N Dec. 216 (BIA 2025)." Id.

## II. Petition

### A. Jurisdiction

A federal court may issue a writ of *habeas corpus* when the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2241(c)(3). A petitioner may file a petition under §2241 to challenge detention orders in immigration proceedings. Zadvydas v. Davis, 533 U.S. 678, 688 (2001).

This court agrees with the other judges in this district who have decided that federal district courts have jurisdiction to consider such petitions in immigration proceedings if "the petitioner is not asking the court to review a removal order, the decision to *initially* detain him or seek his removal, or any part of the process by which his eligibility for removal will be determined." Ramirez Valverde v. Olson, Case No. 25-cv-1502, 2025 WL 3022700, at *1 (E.D. Wis. Oct. 29, 2025), appeal filed December 23, 2025 (citing Jennings v. Rodriguez, 583 U.S. 281, 294 (2018) (Judge Conway)). "Title 8, United States Code, Sections 1252(a)(2)(B)(ii), (b)(9), and (g), do not deprive a federal district

3

court of jurisdiction to consider challenges to a person's detention pending removal." Id. (citing H.G.V.U. v. Smith, No. 25 CV 10931, 2025 U.S. Dist. LEXIS 205993, at *5-*8, 2025 WL 2962610, at *3 (N.D. Ill. Oct. 20, 2025)). See also, Cirrus Rojas v. Olson, Case No. 25-cv-1437, 2025 WL 3033967, at *3-4 (E.D. Wis. Oct. 30, 2025), appeal filed Nov. 25, 2025 (citations omitted) (Judge Ludwig); Lopez De La Cruz v. Schmidt, Case No. 25-cv-1562, Dkt. No. 18 at 3-5 (E.D. Wis. Nov. 19, 2025) (Judge Adelman); Ugarte-Arenas v. Olson, Case No. 25-C-1721, 2025 WL 3514451, at *3 (E.D. Wis. Dec. 8, 2025), appeal filed January 7, 2026 (Judge Griesbach).

      B.     The Parties' Arguments

The parties briefed this petition before the Seventh Circuit issued its final ruling in Castañon-Nava v. Dep't of Homeland Security, 161 F.4th 1048 (7th Cir. 2025).

The petitioner filed his brief on December 5, 2025, along with his §2241 petition. Dkt. No. 1.

Six days later, on December 11, 2025, a motions panel of the Seventh Circuit issued an opinion in Castañon-Nava, granting in part and staying in part the government's request for a stay pending appeal of a district court ruling and, in so doing, tentatively concluding that the government was "not likely to succeed on the merits of their argument that those individuals, whom ICE arrested without a warrant, are subject to mandatory detention under § 1225(b)(2)(A)." Castañon-Nava, 161 F.4th at 1062).

On January 20, 2026, the respondents filed their brief in opposition in this case. Dkt. No. 10. The petitioner filed his reply on January 26, 2026. Dkt. No. 11.

The Seventh Circuit issued its final judgment in <u>Castañon-Nava</u> on May 5, 2026.[1]

> 1.  *Petitioner's Arguments* (Dkt. No. 1)

The petitioner argues that his continued detention without eligibility for an individualized bond hearing violates the Immigration and Naturalization Act (INA) and the Due Process Clause of the Fifth Amendment. Dkt. No. 1 at 19, 20. He explains that 8 U.S.C. §1226 authorizes the detention of noncitizens "already in the country," citing <u>Jennings</u>, 583 U.S. at 289, and that it generally provides for a bond hearing at the outset of detention. <u>Id.</u> at 8. The petitioner emphasizes that the respondents are proceeding under 8 U.S.C. §1225(b), which provides for mandatory detention of noncitizens "seeking entry" into the United States, <u>id</u>. at 9-10, rather than under §1226.

---

[1] Federal Rule of Appellate Procedure 40(d)(1) requires a non-governmental party seeking *en banc* review to file a petition seeking such review within fourteen days after entry of judgment, and requires government parties to file within forty-five days after entry of judgment if the case involved an act or omission occurring in connection with duties performed on the United States' behalf. The Seventh Circuit entered final judgment on May 5, 2026. The petitioner's request for *en banc* review would have been due by May 19, 2026; no such request has been filed. Any such request by the government would be due by June 19, 2026. Under Rule 13 of the Rules of the Supreme Court of the United States, a party petitioning for *certiorari* must do so within ninety days after entry of judgment—in this case, by August 3, 2027.

The petitioner contends that a new policy implemented by ICE on July 8, 2025 eviscerated the "well-established understanding of the statutory framework and reversed decades of practice." Id. at 10 (citing U.S. Immigration and Customs Enforcement, Interim Guidance Regarding Detention Authority for Applicants for Admission (July 8, 2025), https://www.aila.org/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission.). He says that the new policy treats all persons who entered the United States without inspection as "applicants for admission" under §1225(b) and subjects all such persons to mandatory detention. Id. The petitioner asserts that on September 5, 2025, the Board of Immigration Appeals issued a published decision adopting that position and holding "that all noncitizens who entered the United States without permission or parole are considered applicants for admission and are ineligible for immigration judge bond hearings." Id. at 11 (citing Matter of Yajure Hurtado, 29 I&N Dec. 216 (BIA 2025).

The petitioner argues that the text of §1225, and its "placement in the overall detention scheme of the INA, make clear that the terms 'applicant for admission' and 'seeking admission' in Section 1225(b)(2) do not include individuals who have entered without inspection and are apprehended when already inside the United States." Id. He points to the title of §1225: "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." Id. He says that §1225(b)(2) refers to the arrival of crewmen and stowaways and uses the word "arriving" to limit the scope of

6

§1225 to those who recently arrived at a border or port of entry. Id. at 12. Finally, he argues that the word "seeking" in the phrase "seeking admission" implies action that would most logically occur at the border upon inspection. Id. at 12. The petitioner asserts that noncitizens who have lived in the country for years and who were apprehended while residing here do not fall under the language of §1225(b)(2). Id.

The petitioner cites Jennings, 583 U.S. at 288, in which the Supreme Court distinguished §1225 from §1226 by explaining that §1225 governs the detention of arriving citizens whereas §1226 applies to noncitizens already "present in the United States." Id. at 12. The petitioner also emphasizes the importance of giving meaning to all provisions of the statutes. Id. at 13. He points to §1226(c), which carves out an exception for categories of inadmissible citizens who otherwise would fall under §1226(a). Id. According to the petitioner, the government's argument that all noncitizens are subject to mandatory detention would render §1226(c) superfluous. Id. The petitioner says that a recent amendment to §1226(c) (the Laken Riley Act, Laken Riley Act, Pub. L. No. 119-1) adds "carve outs that are now subject to mandatory detention under 1226(c)." Id. Again, the petitioner argues that if §1225(b)(2) already had applied to these groups of inadmissible citizens, that portion of the Laken Riley Act would be redundant. Id. at 13-14.

The petitioner also cites congressional intent, longstanding agency practice and the numerous federal court decisions that are consistent with his reading of the statutes. Id. at 14. He asserts that he current detention system

has been in place since the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208 Div. C, §§302-03, 110 Stat. 3009-546, 3009-582 to 3009-583, 3009-585. Id. The petitioner says that after the enactment of the IIRIRA, the Executive Office for Immigration Review drafted new regulations classifying people who entered without inspection as having been detained under §1226(a) and eligible for bond and redetermination. Id. at 14 (citing 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). Id. The petitioner cites decades of practice and asserts that courts across the country, including courts in this district, have reached conclusions consistent with his argument. Id. at 14-15.

According to the petitioner, his mandatory detention is not authorized under §1225(b) because he entered without inspection and lived for three years in the United States prior to being detained. Id. at 16. The petitioner points to his Notice of Custody Determination, which cites §1226(a). Id. He argues that his detention violates §1226(a) because he has not received an individualized custody determination based on his risk of flight or dangerousness. Id. at 17.

Finally, the petitioner says that courts apply the three factors set forth in Mathews v. Eldridge, 424 U.S. 319 (1976) to determine whether civil detention violates a noncitizen's due process rights. Id. He says that the first factor is "the private interest that will be affected by the official action," the second is "the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards" and the third is "the Government's interest, including the function

8

involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. (citing Mathews, 424 U.S. at 335).

With regard to the first factor, the petitioner argues that at the time he filed his brief, he had been detained at the Dodge County Jail for more than two months "in conditions that are indistinguishable from criminal incarceration" and that this continued detention prevented him from seeing his wife and newborn son and going to work to support his family, as well as depriving him of privacy and freedom of movement. Id. at 17-18. Regarding the second factor, he argues that the respondents' current procedures cause an erroneous deprivation of his liberty interest in remaining free from arbitrary confinement. Id. The petitioner also argues that a bond hearing—allowing a judge to make an individualized determination of his risk of flight or dangerousness—is a reasonable alternative for the respondents to pursue. Id. at 18-19. As to the third factor, the petitioner argues that the government's interest in maintaining the current procedure is minimal because it flies in the face of "statutory text, statutory framework, Congressional intent, almost three decades of prior practice, and the decisions of federal courts across the nation." Id. at 19. The petitioner says that "[a]ny government interest in public safety or ensuring that Petitioner attends future immigration proceedings would be satisfied through proper application of Section 1226(a)." Id.

2. *Respondents' Answer* (Dkt. No. 10)

The respondents argue that all foreign nationals seeking admission into the United States must be inspected by immigration officials under 8 U.S.C. §1225(a)(3). Dkt. No. 10 at 3. They say that those who are "present in the United States without being admitted or paroled" are deemed "inadmissible" and subject to removal under 8 U.S.C. §1182(a)(6)(A)(i). Id. at 3-4. The respondents contend that §1225 governs the detention and removal of "applicants for admission," defined as any "alien present in the United States who has not been admitted **or** who arrives in the United States." Id. (emphasis in original) (citing 8 U.S.C. §1225(a)(1)). They cite 8 U.S.C. §1101(a)(13)(A), which defines "admission" and "admitted" as "the lawful entry of the alien into the United States after inspection and authorized by an immigration officer." Id. The respondents compare the two statutes:

> In sum, Section 1225(b) governs the detention of "applicants for admission"—which Congress has defined to include any foreign national "present in the United States who has not been admitted"—while Section 1226(a) governs the detention of foreign nationals who have been previously admitted but are subject to removal proceedings. Section 1225(b) does not provide for release on bond during the removal process, while Section 1226(a) does.

Id. at 6.

According to the respondents, the plain text of the INA states that a foreign national in the United States is an "applicant for admission" until an immigration officer admits that person into the United States. Id. at 7 (citing 8 U.S.C. §1225(a)(1)). Because the petitioner has not alleged that he has been lawfully admitted and because the petitioner acknowledges that he lacks any

10

legal status, the respondents argue that he is deemed to be an "applicant for admission" subject to mandatory detention under §1225(b)(2)(A). Id. The respondents assert that §1225(a)(1) contains no temporal or geographic limitations. Id. at 8. They reiterate that the petitioner never has been inspected or authorized by an immigration officer and argue that this means that he has not been "admitted" to the country. Id. at 9. They assert that his "presence in the United States as an unadmitted foreign national makes him an 'applicant for admission' subject to Section 1225." Id. And they say that because the petitioner has filed an asylum application and asked to have his removal withheld, "he is necessarily 'seeking admission' within the meaning of 8 U.S.C. § 1225(b)(2)(A)." Id.

The respondents argue that because the statutory language is clear, the court need not consider legislative history; but they maintain that if the court were to consider the legislative history, it would find that it supports their position. Id. at 10. They argue that the long-standing practice of detaining those who appeared at a port of entry for inspection, but affording hearings to those who entered the country without inspection, led to an "incongruous result: foreign nationals who had lawfully appeared at a port of entry for inspection but were deemed inadmissible were ineligible for release on bond, while those who surreptitiously entered the county without inspection were entitled to request release on bond." Id. The respondents suggest that Congress amended the INA through the IIRIRA to replace the word "entry" with the word "admission" and the words "exclusion" and "deportation" with the word

11

"removal" proceedings. Id. at 11 (citing Martinez v. Att'y Gen. of the U.S., 693 F.3d 408, 413, n.5). The respondents cite the following House Report on the IIRIRA:

> This subsection is intended to replace certain aspects of the current "entry doctrine," under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry. Hence, the pivotal factor in determining an alien's status will be whether or not the alien has been lawfully admitted.

Id. (citing H.R. Rep. No. 104-469(I), 1996 WL 168995, at 225 (Leg. Hist. Mar. 4, 1996)).

The respondents cite decisions from Judges Ludwig and Griesbach, finding that the "respondent's position was correct" and holding that §1225(b)(2)(A) applies to "unadmitted foreign nationals found inside the United States and mandates their detention through the pendency of removal proceedings." Id. at 13 (citing Cirrus Rojas, 2025 WL 3033967, and Ugarte-Arenas, 2025 WL 3514451). They also urge the court to reject the argument that the historical practice of allowing unadmitted foreign nationals living in the United States to seek release on bond under §1226(a) should override the plain text of §1225. Id.

The respondents acknowledge that federal courts—including courts in this district—have concluded that in these circumstances, §1226—not §1225—controls. Id. at 14 (citing Ramirez Valverde, 2025 WL 3022700; Rivas-Alonso v. Olson, Case No. 25-CV-1660, 2025 WL 3240928, (E.D. Wis. Nov. 20, 2025); Lopez De La Cruz, Case No. 25-cv-1562, Dkt. No. 18. The respondents assert

12

that these decisions are "unpersuasive" for the reasons explained in <u>Cirrus Rojas</u> and <u>Ugarte Arenas</u>. <u>Id.</u> In a footnote, the respondents acknowledge that shortly before the date on which they filed their opposition brief, the Seventh Circuit had ruled on the government's motion to stay in <u>Castañon-Nava</u>, tentatively concluding that the government was "not likely to succeed on the merits" of its interpretation of 8 U.S.C. §1225(b)(2)(A). <u>Id.</u> at 14, n.4. The respondents asserted that that decision was not binding precedent because decisions by a motions panel are summary rulings, often made on a scant record and are "not entitled to the weight of a decision made after plenary submission." <u>Id.</u> (quoting <u>Johnson v. Burken</u>, 930 F.2d 1202, 1205 (7th Cir. 1991)).

Finally, the respondents argue that no due process violation has occurred because Congress specifically has authorized immigration officers to arrest and detain foreign nationals for purposes of removing them from the country. <u>Id.</u> at 15. The respondents assert that the petitioner remains in removal proceedings, his detention has not been prolonged or indefinite and he "cannot demonstrate that there exists 'no reasonable likelihood of his removal in the foreseeable future.'" <u>Id.</u> at 16 (citing <u>Zadvydas</u>, 533 U.S. at 702). The respondents say that the petitioner is receiving the process he is due through his removal proceedings under 8 U.S.C. §1229a(b)(4).

      3.    *Petitioner's Reply* (Dkt. No. 11)

The reply attacks the respondents' reliance on the House Report. Dkt. No. 11 at 1-2. The petitioner points out that the cited text does not address

13

custody provisions contained in either §1225 or §1226 and that another portion of that report explains that "section 1226(a) merely 'restate[s] the existing bond provision." Id. at 2 (citing H.R. Rep. No. 104-469, pt. 1 at 129). He argues that mandatory detention of all foreign nationals who enter without inspection poses practical difficulties for which Congress made no preparations. Id. He says that when considering the IIRIRA, Congress estimated that there were 4,000,000 or more foreign nationals present in the United States who had entered without inspection. Id. (citing H.R. Rep. No. 104-469, pt. 1 at 119 (1996)). He asserts, however, that the IIRIRA increased funding for detention by only 50% and targeted only 8,500 beds. Id. (citing H.R. Rep. No. 104-469, pt. 1 at 123). The petitioner says that the funding increase is consistent with the mandatory detention of only foreign nationals convicted of crimes, not with the mandatory detention of every foreign national present without inspection. Id. The petitioner suggests that the legislative history does not evidence "a sweeping new detention authority over the millions who had entered the United States without inspection. Such authority, as best counsel can tell, was first proposed last year." Id.

C.  Discussion

1.  *Seventh Circuit Precedent*

Petitioners in this district and across the country have been filing petitions under 28 U.S.C. §2241, asking courts to consider the two statutes that govern the detention and removal of noncitizens: 8 U.S.C. §§1225 and 1226. Most of these petitions ask the court to decide whether the petitioner is

14

eligible for release on bond while removal proceedings are pending. Section

1226 provides for the discretionary release of noncitizens on bond; section

1225 requires detention with no opportunity for release on bond.

Until early May 2026, the Seventh Circuit had not addressed the issue.

And because the court's May 5, 2026 decision in <u>Castañon-Nava</u> is a split

decision, arguably the court has not yet "ruled" on it.

The factual background of <u>Castañon-Nava</u> was different from the factual

background in this case. The author of the majority opinion, Judge John Lee,

explained:

> In 2018, Plaintiffs filed this suit against the Department of Homeland Security and the U.S. Immigration and Customs Enforcement ("Defendants"), alleging that they violated 8 U.S.C. § 1357(a)(2) by arresting noncitizens without reason to believe that they were likely to escape before warrants could be obtained. To resolve the lawsuit, in 2022, Defendants and Plaintiffs entered into a Consent Decree that was negotiated over the course of two different administrations. In it, Defendants agreed, among other things, to comply with § 1357(a)(2) when making warrantless arrests and issue a "Broadcast Statement of Policy" affirming "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2)." Dkt. 155-1 at 5, 6, 17.
>
> In exchange, Defendants obtained a dismissal with prejudice and release of all related claims, "avoid[ing] the substantial expense, inconvenience, and distraction of further protracted litigation ... and finally put[ting] to rest and terminat[ing]" the action. *Id.* at 2. Defendants do not challenge the validity of the original Consent Decree or the authority of the district court to enter it.
>
> Instead, Defendants appeal two orders the district court entered on October 7, 2025, and November 13, 2025. As to the former, Defendants object to the district court's decision to extend the Consent Decree by 118 days due to Defendants' substantial noncompliance with its terms. As to the latter, Defendants take issue with the district court's order that they release 13 class members, as well as approximately 200 additional individuals,

15

whose arrests (in the district court's words) "potentially" violated § 1357(a)(2).

In December 2025, Defendants filed a motion to stay the orders pending appeal, which we denied in part and granted in part. *See Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048 (7th Cir. 2025). After the benefit of full briefing and oral argument, we now affirm the October 7 order's 118-day extension of the Consent Decree and affirm in part and reverse in part the November 13 order.

Castañon-Nava, 175 F.4th at 833-34 (footnotes omitted).

In Castañon-Nava, the government argued that 8 U.S.C. §1252(f)(1) grants only the Supreme Court the authority to restrain the operation of immigration laws via classwide injunctive relief. Id. at 836. They argued that this "bar" on classwide injunctive relief in immigration enforcement barred the district court from extending the consent decree. Id. at 836-37. That is *not* an issue in this case. This case involves an individual petitioner, not a member of a class.

In Castañon-Nava, the issue of whether a petitioner was entitled to a release hearing under §§1225 or 1226 arose because the district court had ordered thirteen individuals to be released on the ground that they were arrested in violation of the consent decree. Id. at 842. The defendants asserted that order violated §1252(f)(1) because it "restrict[ed] the government's ability to detain noncitizens pursuant to its authority under § 1225(b)(2)(A) and § 1226(a)." Id. at 842. Judge Lee acknowledged that his colleagues—Judge Doris Pryor and Judge Thomas Kirsch—believed that the court should not reach the interpretation of those two statutes "because § 1252(f)(1) proscribes our ability in this case to assess whether § 1225(2)(A) applies in the first

16

instance." Id. at 843. Judge Lee didn't agree and explained why. Id. at 843-44.
He then went on to address "the dispute at hand," which he described as
"whether § 1225(b)(2)(A) applies to noncitizens who are unlawfully within the
United States as well as those who present themselves at its borders and ports
of entry." Id. at 144. Judge Lee concluded—based on the statutory language of
§1225(b)(2)(A), its statutory context, its history and background and the
government's historical practice and understanding—that §1225(b)(1)(A)
"applies to 'applicants for admission" who are seeking lawful entry at the
border or ports of entry and not to noncitizens unlawfully living in the
country's interior." Id. at 856.

If all three panelists—Judge Lee, Judge Pryor and Judge Kirsch—had
agreed both to reach the question of the government's interpretation of
§1225(b)(1)(A) and on the interpretation of it, the Castañon-Nava decision
would have ended this court's analysis. But they did not. Judge Pryor
concurred in the portion of Judge Lee's ruling finding that the government had
"waived reliance on 8 U.S.C. § 1252(f)(1)'s bar on classwide injunctive relief
when they entered the Consent Decree and that the district court did not abuse
its discretion in extending the Consent Decree's terms due to Defendants'
substantial noncompliance." Id. at 857. But she did *not* join the portion of
Judge Lee's opinion that analyzed the government's interpretation of
§1225(b)(2)(A); she opined that the defendants had waived that argument, and
that if they hadn't, the bar on classwide injunctions would have prevented the
district court from reaching the issue. Id. And Judge Thomas Kirsch dissented,

both as to Judges Lee and Pryor's conclusion regarding the government's waiver of the classwide injunctive relief argument and as to Judge Lee's interpretation of §1225. <u>Id.</u> at 863-64.

What is a lower court to do with such a split decision? In <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977), the Supreme Court stated, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 169 n.15 (1976)). In 2021, the Seventh Circuit considered this guidance:

> In recent decades, plurality decisions have become more frequent, especially on some of the most controversial issues the federal courts face. Lower courts have tried to follow the *Marks* instruction in a variety of scenarios, and scholars and lower courts have identified several distinct models for applying *Marks*.
>
> A helpful guide comes from Professor Ryan Sullivan:
>
>> The first of these approaches interprets *Marks* as limited to a narrow subset of plurality decisions reflecting a clearly discernable "implicit consensus" or "common denominator" among justices. The second approach understands *Marks* as an instruction to lower courts to identify the opinion in a plurality decision that reflects the judgment-critical vote—typically the fifth concurring vote—and treat that opinion as the Court's holding. The third and final approach looks for points and majority consensus among different factions of concurring and dissenting Justices on distinct legal issues raised by the plurality decision.
>
> Ryan Williams, *Questioning Marks: Plurality Decisions and Precedential Constraints*, 69 Stan. L. Rev. 795, 806-07 (2017).

Planned Parenthood of Ind. and Ky., Inc. v. Box, 991 F.3d 740, 743-44 (7th Cir. 2021). The court went on to say that the first model—the "common denominator" model—is "predominant in precedent." Id. at 744.

Assuming that the "narrowest ground" rule also serves as a guide to district courts attempting to apply fragmented Seventh Circuit decisions, the court has tried to apply the "common denominator" model to the Seventh Circuit's decision in Castañon-Nava. In doing so, it concludes that the "narrowest ground" on which concurring members of the panel agreed was the conclusion that the Department of Homeland Security and U.S. Immigration and Customs Enforcement had waived their ability to rely on §1252(f)(1)'s bar on classwide injunctive relief when they entered into the consent decree and that the district court hadn't abused its discretion in extending that decree. That is the only ground on which two of the three members of the Castañon-Nava panel agree. It does not appear, therefore, that there is binding precedent from the Seventh Circuit regarding the competing interpretations of §1225(b)(2)(A) that the parties put forward here.

### 2. *This Court's Analysis*

"As with all questions of statutory interpretation, we start with the text of the statute to ascertain its plain meaning." United States v. Melvin, 948 F.3d 848, 851 (7th Cir. 2020) (quoting Jackson v. Blitt & Gaines, P.C., 833 F.3d 860, 863 (7th Cir. 2016)).

> In ascertaining a statute's plain meaning, we "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 . . . (1988). Unless words are otherwise defined, they

19

> "will be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 . . . (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 . . . (1979)). We find words' ordinary, contemporary, common meaning by looking at what they meant when the statute was enacted, often by referencing contemporary dictionaries. *Jackson*, 833 F.3d at 863. If the statutory language's plain meaning is unambiguous, our inquiry ends there. *See River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 649 (7th Cir. 2011).

Id. at 852. And the court must read the statute in a way to give effect to all provisions, "so that no part will be inoperative or superfluous, void or insignificant." Corley v. United States, 556 U.S. 303, 314 (2009).

The respondents assert that under §1225, *all* noncitizens are subject to mandatory detention. But the title of §1225 is, "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." It specifically references "*arriving* aliens"—not "all" aliens or "aliens" without a modifier. Although a statute's title cannot not override the plain text of a statute, the Supreme Court has "long considered that the 'title of a statute and the heading of a section' are 'tools available for the resolution of a doubt.'" See Dubin v. United States, 599 U.S. 110, 120–21 (2023) (internal quotation marks and citations omitted).

Subsection (a)(1) of §1225 defines "applicant[s] for admission" as

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

"Admitted" is defined elsewhere in Title 8 as the "lawful entry . . . into the United States after inspection and authorization by an immigration officer." 8 U.S.C. §1101(a)(13)(A). Section 1225 explains that "all aliens (including alien crewman) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. §1225(a)(3).

That is §1225(**a**)(1). There is a separate track under §1225(**b**)(1) for processing arriving aliens and "certain other aliens who have not been admitted or paroled." This includes those who are inadmissible due to fraud, misrepresentation or lack of valid documentation; those whom an officer determines are inadmissible and seeking asylum; and other aliens who receive special designation by the Attorney General. 8 U.S.C. §1225(b)(1)(A)(i)-(iii)). Applicants for admission covered by §1225(**b**)(1) are removed "without further hearing or review" under an expedited removal process, unless the alien "indicates either an intention to apply for asylum . . . or a fear of persecution," in which case that alien is referred for an asylum interview. 8 U.S.C. §1225(b)(1)(A)(i)-(ii).

Important to the resolution of this dispute, §1225(b)(**2**) applies to all "applicants for admission" not covered by 1225(b)(**1**). Section 1225(b)(**2**) states that "in the case of an alien who is **an applicant for admission**, if the examining immigration officer determines that an **alien seeking admission** is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C.

21

§1225(b)(2)(A) (emphasis added). The phrase "seeking admission" is not defined by statute, but "seeking" is the present participle of the verb "seek;" it implies a present action. "Admission" is defined as a request for lawful entry after inspection and authorization. See 8 U.S.C. §1101(a)(13)(A). Read together, §1225(b)(2) requires mandatory detention of a noncitizen who presently is seeking entry but whom the immigration officer has determined is not clearly entitled to be admitted.

In contrast, §1226 is titled "Apprehension and detention of aliens." That section states that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. §1226(a). While that decision is pending, the Attorney General may "continue to detain the arrested alien," "release the alien on bond of at least $1,500" or "release the alien on conditional parole." 8 U.S.C. §§1226(a)(1)-(2). An immigration officer authorized to issue an arrest warrant may release an alien if the alien demonstrates that he does not pose a danger to property or persons and that he is likely to appear for future proceedings. 8 C.F.R. §1236.1(c)(8). After the district director makes the initial custody determination (including the setting of a bond), the alien may seek "amelioration" of release conditions, and prior to any final order, an immigration judge may detain the alien, release him or set a bond. 8 U.S.C. §1236.1(d)(1). The Attorney General may revoke bond or parole, and may rearrest and detain the alien "under the original warrant." 8 U.S.C. §1226(b). The United States Supreme Court has referred to §1226 as the "default rule"

22

for arresting and detaining aliens "already present in the United States" pending removal. <u>Jennings</u>, 583 U.S. at 303.

There is an exception under §1226(c) that requires the detention of persons "who fall[ ] into one of the enumerated categories involving criminal offenses and terrorist activities." <u>Jennings</u>, 583 U.S. at 303; 8 U.S.C. §1226(c)(1)(E)(i)-(ii). These individuals are not entitled to a bond hearing and may be released under very limited circumstances. 8 U.S.C. §1226(c)(4). Congress recently amended §1226 to include in this section any alien who has been "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or bodily injury to another person." Laken Riley Act, Pub. L. No. 119-1, §2, 139 Stat. 3, 3 (2025).

Giving effect to both §1225 and §1226, the United States Supreme Court has offered the following guidance:

> U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c).

<u>Jennings</u>, 583 U.S. at 289.

Relying on the plain language of both statutes, and giving meaning to all of the language of both statutes, the court concludes that the petitioner falls under the ambit of §1226. The petitioner is a noncitizen. He already was in the country at the time of his arrest. He was not seeking admission into the

23

country at a border or port of entry, nor was he seeking admission after inspection. Currently he is awaiting a decision regarding his removal.

In the three decades prior to 2025, this petitioner—a noncitizen who'd been living in the country for several years—would have been entitled to a bond hearing under §1226. In 2025, however, the Department of Homeland Security implemented a new policy amounting to a conclusion that prior administrations, the agency and the courts had been misinterpreting the language of §1226 for those three decades. The agency now treats everyone who has entered the United States illegally as an applicant for admission under §1225(a)(1) regardless of how long that person has been present in the United States or how far they are found from the border. The Board of Immigration Appeals gave force to that policy by holding that immigration judges lacked the authority to consider requests to release on bond persons who entered the country without inspection. <u>Matter of Hurtado</u>, 29 I. & N. Dec. 216, 229.

But the respondents' reading of the statute classifying every noncitizen as an "applicant for admission" renders superfluous the language in §1226(c)(1) and cannot be squared with the text of the statute or the facts of this case. The respondents admit that the petitioner entered the United States on November 27, 2022, and "has never been inspected or authorized by an immigration officer and therefore has not been 'admitted' in the United States." Dkt. No. 10 at 9. It appears that the petitioner lived and worked in the United States for three years without being charged or convicted of any crime and without facts that would otherwise make him "inadmissible" under §1225 or

24

§1226. The respondents admit that at some point, the petitioner was placed on a monitoring program "administered through the issuance of a cell phone device" "as a discretionary alternative to detention." Dkt. No. 10 at 3. Even in the petitioner's notice to appear, the issuing officer classified the petitioner as "an alien present in the United States who has not been admitted or paroled," rather than "an arriving alien." Dkt. No. 2-1 at 2.

In his opinion in Castañon-Nava, 175 F.4th at 848-56, Judge Lee looked beyond the plain language of the statute. He considered the statutory context, the legislative history and the thirty years during which the executive branch had interpreted §1225(b)(2)(A) as applying only to applicants for admission seeking entry at borders or entry ports. He summarized his holding:

> [T]he text, statutory context, legislative history, and long-standing Executive practice all confirm that § 1225(b)(2)(A) applies to 'applicants for admission' who are seeking lawful entry at the border or ports of entry and not to noncitizens unlawfully living in the country's interior. Given the statute's history, it is unreasonable to think that Congress in 1996 intended to subject millions of noncitizens to mandatory detention in the oblique, off-handed fashion that the Defendants claim. Thus, Defendants lacked the authority in the first instance to place the individuals at issue, all of whom were already within the United States, under mandatory detention pursuant to §1225(b)(2)(A).

Id. at 856.

As this court has explained, the precedential impact of this conclusion, given that Judges Pryor and Kirsch did not join it, is unclear. But a week before the final judgment in Castaño-Nava, a panel of the Second Circuit issued a decision in Barbosa Da Cunha v. Freden, 175 F.4th 61 (2d Cir. 2026). All three members of that panel reached the conclusion reached by Judge Lee,

25

but additionally opined that the government's interpretation raises grave

constitutional concerns:

> . . . Petitioner is protected by the Fifth Amendment's Due Process Clause, requiring any civil detention to be "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690 . . .; *see also Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) ("[T]he Due Process Clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent."). While noncitizens can be detained temporarily to "give[ ] immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity," *Jennings*, 583 U.S. at 286 . . . that is not what is going on here, where detention is mandatory regardless of these risks. We discern no basis for subjecting all noncitizens in Petitioner's shoes to categorical detention without bond. As the government conceded at oral argument, Petitioner, like many unlawfully present noncitizens, presents no risk of flight nor any danger to the community. Indeed, when ordered by the district court to provide Petitioner with a bond hearing, the Agency agreed that he presented no such risks and released him.
>
> The government's interpretation would also likely subject Petitioner to unconstitutionally prolonged detention. Before he was arrested, Petitioner's asylum application was pending for nearly a decade, and it still has not been resolved. And while the government represents that removal is "practically attainable" for Petitioner, Appellant's Reply Br. at 32, proceedings have already lasted more than six months since his arrest with no clear end in sight. In fact, his next hearing is scheduled for June 28, 2027. See *EOIR Automated Case Info., Exec. Off. for Immigr. Rev.*, https://acis.eoir.justice.gov/en (search by 209 454 653, Brazil, or access an archived version at https://perma.cc/257V-4KT2) (last visited Apr. 27, 2026). Detaining Petitioner without a bond hearing until then would "raise[ ] serious due process concerns" under our precedents. *Black* [*v. Decker*] 103 F.4th [133, 150 (2d Cir. 2024)]; *see Velasco Lopez*, 978 F.3d at 855 (holding that continued detention of a noncitizen under Section 1226(a) for fifteen months pending removal violated due process).
>
> These concerns are compounded by the fact that noncitizens have no right to counsel and are therefore often unrepresented in removal proceedings. *See* 8 U.S.C. § 1229a(b)(4)(A). Unlike criminals detained for punitive purposes, noncitizens like Petitioner thus lack

26

the ability to reliably challenge their detention or the conditions in which they are being held.

Id. at 94. Although the Second Circuit's decision is not binding on this court, the court shares the Second Circuit's concerns.

The court acknowledges that the Fifth and Eighth Circuits have endorsed the respondents' position, Buenrostro-Mendez v. Bondi, 166 F.4th 494 (5th Cir. 2026) and Avila v. Bondi, 170 F.4th 494 (8th Cir. 2025). But the court finds more persuasive the petitioner's reasoning, as well as that of the Second Circuit, in finding that §1225(b)(2)(A) applies to those noncitizens who are applicants for admission and seeking admission at the border or port of entry, and that §1226 applies to those noncitizens arrested in the interior of the country.

Because the petitioner was arrested long after his entry and many miles from the border, he falls under 8 U.S.C. §1226. The court finds that his continued detention under §1225 without a bond hearing violates federal law

## III.  Conclusion

The court **ORDERS** that the petition, filed under 28 U.S.C. §2241, dkt. no. 1, is **GRANTED** under the following conditions:

The court **ORDERS** that within seven days of the date of this order, the respondents must (1) afford the petitioner a bond hearing before an immigration judge under 8 U.S.C. §1226(a), at which time the government must bear the burden of justifying the petitioner's detention by proving, by clear and convincing evidence, the petitioner's dangerousness or flight risk; or

27

(2) if the respondents cannot otherwise comply with the court's order, release the petitioner from custody under reasonable conditions of supervision.

The court **ORDERS** that this case is **CLOSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 17th day of June, 2026.

BY THE COURT:

**HON. PAMELA PEPPER**
**Chief United States District Judge**

28